## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN BANKHURST, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-253 |
| *Plaintiff*, | **Jury Trial Demanded** |
| v. | |
| SUB-ZERO GROUP INC., and WOLF APPLIANCE, INC. | |
| *Defendants*. | |

## <u>CLASS ACTION COMPLAINT</u>

## Table of Contents

I.      Introduction. ........................................................................................................... 1

II.     Parties. .................................................................................................................... 1

III.    Jurisdiction and Venue. .......................................................................................... 2

IV.     Facts. ....................................................................................................................... 2

      A.      Gas stoves produce health-harming pollutants ................................................ 3

      B.      Defendants know of this defect. ....................................................................... 5

      C.      Safe alternative designs that would reduce the danger are available. ............. 6

      D.      Defendants should have warned of the pollutant risk. ..................................... 7

      E.      Defendants overcharge thousands of consumers. ............................................ 8

      F.      Plaintiff was misled and harmed by Defendants ............................................. 8

      G.      No adequate remedy at law. ............................................................................. 9

V.      Class Action Allegations. ..................................................................................... 10

VI.     Causes of Action. .................................................................................................. 12

VII.    Jury Demand. ........................................................................................................ 20

VIII.   Prayer for Relief. .................................................................................................. 20

## I.      Introduction.

1.      About 40% of American households use natural gas to cook. Many households use the gas stoves and cooktops daily to cook in the home.  Studies confirm however, that gas cooking has important risks.  Gas stoves "emit air pollutants… at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[1]  For example, gas cooking emits nitrogen oxides, which are "gases [that] can worsen asthma and other lung diseases."[2] This is true for all consumers, adults and children alike, but is especially risky for children. *Id.*  Children living in households with gas stoves are "42% more likely to have asthma."[3]

2.      This risk is avoidable; manufacturers can reasonably design gas stoves to mitigate the risk of pollutants.  Manufacturers also can—and should—disclose the risk of pollutants to consumers, who can then make an informed choice about whether to buy a gas or electric appliance (which does not carry the same risk).

3.      Defendants Sub-Zero Group, Inc. and Wolf Appliance, Inc. make, sell, distribute, and market household appliances, including Wolf brand gas stoves, cooktops, and ovens. Plaintiff purchased a gas cooktop made by Defendants.  Plaintiff believed that the product was free from defects, and he did not know that gas cooking has significant pollutant risks. Had he known of the risks of pollutants from the gas cooktop, he would not have purchased it.

4.      Plaintiff brings this case for himself and for other consumers who purchased Defendants' gas stoves, cooktops, and ovens.

## II.     Parties.

5.      Plaintiff John Bankhurst is domiciled in Chicago, Illinois.

6.      The proposed class and subclass (identified below) include citizens of all states.

---

[1] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears
[2] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/
[3] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

7.      Defendant Sub-Zero Group, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

8.      Defendant Wolf Appliance, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

8.      Defendants make, distribute, sell, and market gas stoves, cooktops, and ovens products (including under the brand name Wolf), and have done so throughout any applicable statute of limitations period.

**III.    Jurisdiction and Venue.**

9.      This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from Defendants.

10.     This Court has personal jurisdiction over Defendants. Defendants have their principal places of business in Wisconsin.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d). Defendants would be subject to personal jurisdiction in this District if this District were a separate state. Defendants are incorporated and have their principal place of business in this District.

**IV.    Facts.**

12.     About 40% of American households use natural gas stoves.[4] Many households use natural gas daily to cook in the home.

---

[4] https://www.washingtonpost.com/business/energy/biden-isnt-coming-for-your-gas-stove-states-are/2023/01/13/12353d1e-9353-11ed-90f8-53661ac5d9b9_story.html

13.     Defendants make, market, distribute, and sell residential gas stoves, gas cooktops, and gas ovens ("Defendants' Products" or "Products"), including under the brand name Wolf. Some examples of Defendants' Products are shown below:[5]



14.     Defendants sell their products specifically for home use, and market to consumers for home use.  In fact, the only intended use for Defendants' Products is for cooking inside the home.

**A.     Gas stoves and cooktops produce health-harming pollutants.**

15.     Studies have confirmed that cooking with gas harms the health of the households that use it.[6]  Gas stoves "emit air pollutants such as nitrogen dioxide, carbon monoxide and fine particulate matter at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[7]

---

[5] https://www.subzero-wolf.com/wolf/configurator#sort=%40displayorder%20descending&numberOfResults=21&f:Type=[Gas]&wolfcategory=Ranges

[6] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/

[7] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears

16.     In particular, nitrogen oxides (sometimes written as NOx or NO2),[8] are hazardous to human health.  A "study published by researchers at Stanford calculated that emission of nitrogen dioxide from certain gas burners or ovens rose above the standard set for outdoors by the Environmental Protection Agency (EPA) within a few minutes."[9]

17.     Further, "EPA research also linked long-term NO2 exposure to cardiovascular effects, diabetes, poorer birth outcomes, premature mortality, and cancer."[10] It is also linked to "reduced cognitive performance, especially in children."  *Id.*  "[E]arly-life exposure to air pollution from indoor gas appliances may be negatively associated with neuropsychological development through the first 4 years of life, particularly among genetically susceptible children."  *Id.*  "The gases can worsen asthma and other lung diseases."[11] "In short, research shows that even low levels of NO2 exposure are dangerous, especially to the vulnerable."[12]

18.     "Yet…homes with gas stoves have around 50 percent, ranging up to over 400 percent, higher levels of NO2 than homes with electric stoves."[13] Concentrations of NO2 emissions from gas stoves can exceed US outdoor pollution standards several times over when conducting common cooking tasks like boiling water, baking a cake, roasting meat, and frying bacon with a gas stove.  *Id.*  Thus, children living in households with gas stoves are "42% more likely to have asthma."[14]  A recent study "found that 12.7%...of current childhood asthma in the

---

[8] The term NOx is a common term for nitrogen oxides that include nitric oxide (NO) and nitrogen dioxide (NO2). https://www.encyclopedia.com/earth-and-environment/ecology-and-environmentalism/environmental-studies/nox-nitrogen-oxides

[9] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

[10] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[11] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/

[12] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[13] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[14] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

US is attributable to gas stove use."[15] This is a level that is "similar to the childhood asthma burden attributed to secondhand smoke exposure."[16] Data shows that, "the higher the nitrogen dioxide level, the more severe the asthma symptoms in children and adults."[17]

19.    For these reasons, the American Medical Association adopted a resolution "recogniz[ing] the association between the use of gas stoves, indoor nitrogen dioxide levels and asthma," and committed to informing "members and, to the extent possible, health care providers, the public, and relevant organizations that use of a gas stove increases household air pollution and the risk of childhood asthma and asthma severity."[18]

**B.    Defendants know of this defect.**

20.    Defendants are aware that its Products emit health-harming pollutants.

21.    Since the 1980s, the natural gas industry—of which Defendants are constituents—has worried that the US Consumer Product Safety Commission would regulate gas cooking appliances due to indoor air quality concerns.[19]

22.  This is because "[s]cientists have long known that gas stoves emit pollutants that irritate human airways and can cause or exacerbate respiratory problems."[20] "[S]tudies dating back decades have shown harmful effects from the NO2 in gas cooking stoves."[21]

23.    In 1986, a report by the Clean Air Scientific Advisory Committee of the U.S. Environmental Protection Agency stated, "Health effects data from epidemiological studies in gas stove homes suggest that young children are at increased risk of respiratory symptoms; and

---

[15] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)
[16] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)
[17] Have a gas stove? How to reduce pollution that may harm health - Harvard Health
[18] https://policysearch.ama-assn.org/policyfinder/detail/gas%20stove?uri=%2FAMADoc%2Fdirectives.xml-D-135.964.xml; https://publicinterestnetwork.org/updates/update-ama-moves-forward-resolution-gas-stove-pollution/
[19] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it; https://www.sciencenews.org/archive/cleaner-cooking-gas
[20] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/
[21] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/

infection from exposures to elevated concentrations of N02. Other groups at risk to N02 exposures are asthmatics and bronchitics."[22] It further warned, "Human epidemiologic studies suggest that exposure to nitrogen dioxide may lead to increased respiratory illness rates among children." *Id.* at 6.

24.   Subsequent studies have confirmed the harmful effects of pollutants from gas cooking.  "In a 1992 meta-analysis of studies on this topic, scientists at the EPA and Duke University found that nitrogen dioxide exposure that is comparable to that from a gas stove increases the odds of children developing a respiratory illness by about 20 percent."[23]  "A 2013 meta-analysis of 41 studies found that gas cooking increases the risk of asthma in children and that NO2 exposure is linked with currently having a wheeze." *Id.*  And "a study published last December found that 12.7 percent of childhood asthma cases in the U.S. can be attributed to gas stove use." *Id.*

25.   Like other makers of gas appliances, Defendants monitor and keep track of research on the health effects of its products.  This is diligence that large companies like Defendants routinely do when selling a consumer product.   Defendants are aware of the fact that their Products emit harmful pollutants.  Defendants are further aware that use of gas cooking appliances increases the rates of respiratory illness in adults and children.

**C.   Safe alternative designs that would reduce the danger are available.**

26.   Further, the harms could have been avoided through safe, reasonable alternative designs.  Alternative designs that "reduce harmful emissions, without sacrificing heat, have been available for decades."[24]  As one example, the "jet-powered infrared gas-range burner," developed in the 1980s, "consumed about 40% less natural gas to reach cooking temperatures and emitted 40% less nitrogen oxides."[25] Another design proposed in the 1980s was the use of a

---

[22] Report of the Clean Air Scientific Advisory Committee, May 9, 1986, at 5.
[23] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/
[24] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it
[25] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it

flame insert, which cuts the NOx emissions "more than 40 percent" when the burner is turned on high, and even more at low burner settings.[26]

27.     Despite this, Defendants failed to use an alternative design to avoid these harms and reduce harmful pollutants from its gas cooking appliances.

**D.    Defendants should have warned of the pollutant risk.**

28.     While Defendants are aware of the harmful health effects of gas cooking, everyday consumers are unaware of these risks.  Consumers shopping for a new oven, cooktop, or stove have very little information about the health risks of gas appliances.

29.     Consumers remain unaware because nothing on Defendants' packaging, instructions, or warning labels suggest that the gas cooking appliances regularly emit pollutants that are harmful to human health. Further, the labels and warnings do not mention any risk of nitrogen oxides.

30.     Defendants sold their Products for cooking inside the home, while omitting any warning of the serious defect due to the harmful emissions.  Defendants knew of the defect, but actively concealed it.  Defendants should have, but did not, warn consumers of the fact that its Products emit harmful nitrogen oxides and pollutants when used for cooking. These warnings could have been included on the packaging, stickers, or instruction manual for the product.  But Defendants did not include any such warning.

31.     Defendants had a duty to warn of the defect.  The defect was an unreasonable safety hazard.  Defendants could have avoided this risk by using available design-arounds.  In addition, the defect was central to the Product's function (i.e. its safety for use cooking inside the home).  Defendants had exclusive knowledge of the defect. Defendants actively concealed the defect from consumers by failing to disclose it.  Defendants also made partial representations that are misleading because other material facts were not disclosed.  For example, they warned of some risks of the Products (e.g., it included extensive warnings about fire), but failed to warn that the Products emit harmful pollutants like nitrogen oxide.  This led consumers to believe that

---

[26] https://www.sciencenews.org/archive/cleaner-cooking-gas

there was no such risk.

**E.      Defendants overcharge thousands of consumers.**

32.      If Defendants disclosed the truth— that is, that their Products emit harmful pollutants, the price of their Products would fall dramatically.

33.      For example, a recent study showed that consumer demand for gas stoves falls as consumers become informed of the harms of gas stoves. Forty-six percent of gas-stove owning adults were interested in replacing their gas stoves after being informed of the study showing the link between gas stove pollution and childhood asthma.[27]

34.      If consumers knew the truth, demand for Defendants' Products would drop, and Defendants could not sell their Products at current prices.

35.      In addition, the defective design of gas stoves, cooktops, and ovens reduces their value.  Consumers pay for a product that is safe for home cooking, but receive a less valuable product—one with a defective design that carries significant (and undisclosed) air pollution risks.

**F.      Plaintiff was misled and harmed by Defendants.**

36.      In April 2018, John Bankhurst purchased a Wolf gas cooktop from a local appliance store in Chicago, Illinois.  The product had the model number of CG365PS.[28]



---

[27] https://morningconsult.com/2023/01/31/natural-gas-stove-bans-remain-divisive/
[28] *See* https://www.subzero-wolf.com/wolf/cooktops-and-rangetops/gas-stovetop/36-inch-professional-gas-cooktop-5-burners

37.     In purchasing the item, Mr. Bankhurst relied on the representations on the marketing materials and stickers on the cooktop disclosing risks.  The marketing materials and the stickers did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides.  Thus, at the time of purchase, Plaintiff was unaware that the product emitted harmful pollutants such as nitrogen oxide.

38.     Plaintiff did not discover the truth until the fall of 2022, when he saw news reports of the risks of harmful pollutants from gas appliances. He could not have made the discovery earlier despite reasonable diligence. Reasonable consumers do not conduct independent research on potential defects of consumer products. Instead, it was only after there was widespread media coverage of the issue (in the fall of 2022), that Plaintiff discovered the truth. Prior to this date, Plaintiff was unaware of the defect and these risks.

39.     Plaintiff purchased Defendants' Product on the assumption that using the Product would not expose him to a significant air pollutant risk. Plaintiff would not have purchased Defendants' Product had he known that it emitted harmful pollutants like nitrogen oxide.

40.     As a result, Plaintiff suffered injury in fact when he: (a) spent money to purchase a Product he would not otherwise have purchased absent Defendants' misconduct; (b) overpaid for the Product due to Defendants' misconduct; and (c) paid for a defective product that, in truth, is worth less than he paid for it.

41.     Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiff likes Defendants' Products, and would purchase Defendants' Products in the future if the Product was redesigned to avoid emitting harmful pollutants. He faces an imminent risk of harm, however, because he cannot rely on representations that the Product is safe for cooking inside the home or the absence of any pollutant warning. Absent injunctive relief, Defendants may continue to advertise, promote, and sell the Products while representing that it is safe, and without warning the public about the health risks.

**G.     No adequate remedy at law.**

42.     Plaintiff seeks damages and, in the alternative, restitution.  Plaintiff is permitted to

seek equitable remedies in the alternative because he has no adequate remedy at law.

43.   The remedies at law available to Plaintiff are not equally prompt or otherwise efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will take longer, and be more expensive, than a bench trial.

**V.   Class Action Allegations.**

44.   Plaintiff brings certain claims on behalf of the proposed class of:

- Nationwide Class: all persons who purchased Defendants' Products while living in the United States during the applicable statute of limitations (the "Nationwide Class"); and

- Illinois Subclass: all persons who, while living in the state of Illinois, purchased Defendants' Products during the applicable statute of limitations (the "Illinois Subclass").

45.   The following people are excluded from the proposed Class and Subclass: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

46.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

*Numerosity & Ascertainability.*

47.   The proposed class contains members so numerous that separate joinder of each member is impractical.  There are tens or hundreds of thousands of class members.  The precise number of class members is unknown to Plaintiff at this time.

48.    Members of the proposed class can be identified through public notice.

***Predominance of Common Questions.***

49.    There are questions of law and fact common to the proposed class.  Common questions of law and fact include, without limitation:

(1) Whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

(2) Whether Defendants' conduct was unfair and/or deceptive;

(3) Whether Defendants breached an implied warranty;

(4) What damages are needed to compensate Plaintiff and the proposed class; and

(5) Whether an injunction is necessary to prevent Defendants from continuing to market and sell the Products.

***Typicality & Adequacy.***

50.    Plaintiff's claims are typical of the other class members' claims.  Like other class members, Plaintiff purchased Defendants' Product.

51.    The interests of the members of the proposed class and subclass will be adequately protected by Plaintiff and his counsel. Plaintiff's interests are aligned with, and do not conflict with, the interests of the members of the proposed class or subclass that they seek to represent. Moreover, Plaintiff has retained experienced and competent counsel to prosecute the class and subclass' claims.

***Superiority.***

52.    The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that the same product is found unfit for its ordinary use for some proposed class members, but not for others.

53.    Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from

11

certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## VI.    Causes of Action.

### Count I: Violation of Magnuson-Moss Warranty Act,

### 15 U.S.C. §2301, *et seq.*

### (on behalf of Plaintiff and the Nationwide Class)

55.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

56.     Plaintiff brings this count individually and for the Nationwide Class, or in the alternative, the Illinois Subclass.

57.     Defendants' Products are each a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(1).

58.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(3).

59.     Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(4)-(5).

60.     As the manufacturers of residential gas appliances, Defendants impliedly warranted to Plaintiff and the class that the Products were of merchantable quality and were safe for their ordinary use in home cooking.

61.     As described in detail above, the Products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used. Specifically, the Products are inherently flawed given a defect in design making them emit health-harming pollutants when used to cook inside the home.  The defective design makes them

12

unfit for ordinary purposes even when used correctly.

62.     In addition, Defendants' Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

63.     Thus, Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

64.     Defendants also impliedly warranted to Plaintiff and the class that the Products were suitable and fit for a particular purpose.  Plaintiff and class members purchased Defendants' Products for the particular purpose of cooking inside the home.  As explained in detail above, Defendants knew, or had reason to know, that Plaintiff and class members were purchasing the Products for the particular purpose of cooking inside the home.

65.     Defendants market themselves as knowledgeable and effective developers and purveyors of home appliances, such as gas stoves, cooktops, and ovens. As explained more fully above, Defendants knew, or had reason to know, that Plaintiff and class members would justifiably rely on Defendants' particular skill and knowledge of home appliances in selecting or furnishing products suitable for home use. Plaintiff and class members did justifiably rely on Defendants' judgment and skill.

66.     Due to the defect in the Products, the Products are not suitable for their intended purpose.

67.     Defendants' breach of implied warranties has deprived Plaintiff and class members of the benefit of their bargain.

68.     Plaintiff and the class were foreseeable third-party beneficiaries of Defendants' sale of the Products.  Defendants sell the Products to retailers for distribution and sale to consumers such as Plaintiff and class members.

69.     The amount in controversy of Plaintiff's individual claim exceeds $25.  The amount in controversy of this action exceeds the sum value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

70.     Defendants have been afforded a reasonable opportunity to cure its breach,

including after Plaintiff sent a notice letter informing Defendants of the breach.

71.     Defendants' breaches directly caused Plaintiff and class members harm.  Plaintiff and class members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

**Count II: Breach of the Illinois Consumer Fraud and**

**Deceptive Business Practices Act, 815 ILCS 505/2**

**(on behalf of Plaintiff and the Illinois Subclass)**

72.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

73.     Plaintiff brings this cause of action on behalf of himself and members of the Illinois Subclass, seeking reasonable attorneys' fees, actual damages, and other relief.

74.     Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

75.     Plaintiff and the members of the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

76.     Plaintiff and the Illinois Subclass purchased the Products in Illinois.

77.     The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

78.     Defendants participated in misleading, false, or deceptive acts that violated the Illinois statute. The conduct alleged in this Complaint constitutes unfair or deceptive methods of

14

competition, and the conduct was undertaken by Defendants in transactions intended to result in reliance.  The conduct did result in, the sale of goods to consumers.

79.     As alleged more fully above, Defendants advertised their Products in a way that is misleading or is likely to deceive consumers. Defendants' statements and omissions led Plaintiff and other members of the Illinois Subclass to believe that their Products are safe and fit for ordinary use when cooking in the home, when in fact, the Products emit health-harming pollutants. Defendants also failed to warn of a material defect with the product. Defendants' representations and omissions concerning the Products' defect were misleading.  Defendants' representations and omissions were likely to deceive, and did deceive, a substantial portion of the public into believing that the product did not suffer from a defect.

80.     Even though Defendants were aware of a material defect— that the Products emitted health-harming pollutants including nitrogen dioxides—Defendants sold their Products without notifying customers of this defect.  Instead, Defendants omitted this information, and intended that consumers would rely on the omission.  Plaintiff and the Subclass relied on Defendants' silence, and purchased Defendants' Products.

81.     As alleged above, Defendants' representations and omissions are unfair.  They offend public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers.

82.     As alleged above, Defendants' representations and omissions were willful and knowing.

83.     Defendants' representations and omissions occurred in the conduct of trade and commerce affecting the people of the State of Illinois.

84.     Defendants' representations and omissions were material. As alleged in detail above, these representations were important to consumers and affected their choice to purchase the Products. And, as alleged in detail above, these representations were likely to mislead, and did mislead, reasonable consumers.

85.     Plaintiff and Subclass members were injured as a direct and proximate result of

Defendants' conduct because: (a) they would not have purchased the Products if they had known of the defect, (b) they overpaid for the Products because the Products are sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

86.     Plaintiff and the Subclass seek actual damages, an injunction, reasonable attorneys' fees, expenses, and all other available relief.

<u>**Count III: Breach of Implied Warranties**</u>

**(on behalf of Plaintiff and the Illinois Subclass)**

87.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in Sections I-IV as though fully set forth herein.

88.     Plaintiff brings this count individually and for the Illinois Subclass.

*Implied Warranty of Merchantability*

89.     The Uniform Commercial Code § 2-314 states that "a warranty that [] goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." "Merchantable" goods must be "fit for the ordinary purposes for which the goods are used."

90.     Defendants are and were, at all relevant times, merchants with respect to home appliances, and with respect to residential Products in particular.  Defendants' Products each constitutes a "good" under the UCC.

91.     Plaintiff and Subclass members purchased Defendants' Products.

92.     As the manufacturers of residential gas appliances, Defendants impliedly warranted to Plaintiff and the Subclass that the products were of merchantable quality and were safe for their ordinary use in home cooking.  In fact, as described in detail above, the products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used.  Specifically, the Products are inherently flawed given a defect in design making them emit health-harming pollutants when used to cook inside the home.  The defective design makes them unfit for ordinary purposes even when used correctly.

16

In addition, Defendants' Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

93.     Thus, Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

94.     Plaintiff and the Subclass were foreseeable third-party beneficiaries of Defendants' sale of the Products.  Defendants sell the Products to retailers for distribution and sale to consumers such as Plaintiff and Subclass members.

95.     Defendants' breach directly caused Plaintiff and Subclass members harm. Plaintiff and Subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

### *Implied Warranty of Fitness*

96.     The Uniform Commercial Code § 2-315 states that where a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

97.      Plaintiff and Subclass members purchased Defendants' Products for the particular purpose of cooking inside the home.

98.     As explained in detail above, Defendants knew, or had reason to know, that Plaintiff and Subclass members were purchasing the Products for the particular purpose of cooking inside the home.

99.     Defendants market themselves as knowledgeable and effective developers and purveyors of home appliances, such as gas stoves, cooktops, and ovens.

100.    As explained more fully above, Defendants knew, or had reason to know, that Plaintiff and Subclass members would justifiably rely on Defendants' particular skill and

knowledge of home appliances in selecting or furnishing products suitable for home use.

101.    Plaintiff and Subclass members did justifiably rely on Defendants' judgment and skill.

102.    Due to the defect in the Products, the Products are not suitable for their intended purpose.

103.    As a result of the breach, Plaintiff and the Subclass suffered economic harm and damage.  Plaintiff and Subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

## Count IV: Fraudulent Omission

### (on behalf of Plaintiff and the Illinois Subclass)

104.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

105.    Plaintiff brings this count individually and for the Illinois Subclass.

106.    As alleged in detail above, Defendants made materially misleading omissions concerning the safety of its Products.  Defendants concealed information about the harmful pollutants emitted by its Products.

107.    In deciding to purchase consumer products from Defendants, Plaintiff and the Subclass reasonably relied on Defendants' omissions to form the mistaken belief that the Products did not pose a significant pollutant risk.

108.    As alleged in detail above, Defendants' fraudulent conduct was knowing and intentional.  The omissions made by Defendants were intended to induce and actually induced Plaintiff and Subclass members to purchase the Products.  Plaintiff would not have purchased the products had he known of the defect.  Subclass-wide reliance can be inferred because Defendants' omissions were material, i.e., a reasonable consumer would consider them important

18

to their purchase decision.

109.    As alleged in detail above, Defendants had a duty to disclose the defect.

110.    Plaintiff and Subclass members were injured as a direct and proximate result of Defendants' fraudulent omissions because (a) they would not have purchased the Products if they had known the Products were unsafe and unfit for use; (b) they overpaid for the Products because the Products are sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

111.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## Count VIII: Quasi-contract

### (on behalf of Plaintiff and the Illinois Subclass)

112.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

113.    Plaintiff brings this count individually and for the Illinois Subclass.

114.    Plaintiff and Subclass members conferred a tangible and material economic benefit upon Defendants by purchasing the Products.

115.    In exchange for the purchase price, Defendants provided a defective product, without a reasonable warning. Defendants knew and appreciated the benefit they incurred from consumers purchasing Products.

116.    Thus, Defendants are aware of, and has retained, the unjust benefit conferred upon them by Plaintiff and the Subclass members.

117.    Defendants received a direct and unjust benefit, at the Plaintiff's and the Subclass's expense.

118.    Plaintiff and the Subclass seek restitution.

**VII.   Jury Demand.**

119.   Plaintiff demands a jury trial on all issues so triable.

**VIII.   Prayer for Relief.**

120.   Plaintiff seeks the following relief individually and for the proposed class and subclass:

- An order certifying the asserted claims, or issues raised, as a class action;
- An order appointing Plaintiff as representative for the Nationwide Class and each Subclass, and appointing their counsel as lead counsel for the classes;
- A judgment in favor of Plaintiff and the proposed classes;
- Damages, treble damages, statutory damages, and punitive damages where applicable;
- Restitution;
- Disgorgement, and other just relief;
- An order awarding Plaintiff and all other class members damages in an amount to be determined at trial for the wrongful acts of Defendants;
- Pre- and post-judgment interest on all amounts awarded;
- Injunctive relief as pleaded or as the Court may deem proper;
- Reasonable attorneys' fees and costs, as allowed by law;
- Punitive damages; and
- Any additional relief that the Court deems reasonable and just.

Dated: April 21, 2023                  Respectfully submitted,

By: */s/ Christin Cho*

Christin Cho (Cal Bar No. 238173)
christin@dovel.com
Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP

201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Attorneys for Plaintiff*