## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN BANKHURST, PAMELA ANDERSON, JONATHAN ZANG, and JESSE KARP, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-253 |
| | **Jury Trial Demanded** |
| *Plaintiffs*, | Hon. William Conley |
| v. | |
| SUB-ZERO GROUP INC., and WOLF APPLIANCE, INC. | |
| *Defendants*. | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

**Table of Contents**

I.      Introduction.............................................................................................................. 1

II.     Parties...................................................................................................................... 1

III.    Jurisdiction and Venue............................................................................................ 2

IV.     Facts......................................................................................................................... 2

      A.      Gas stoves and cooktops produce health-harming pollutants. ..................... 3

      B.      Defendants know of this defect..................................................................... 6

      C.      Safe alternative designs that would reduce the danger are available........... 9

      D.      Defendants should have warned of the pollutant risk. ............................... 10

      E.      Defendants overcharge thousands of consumers. ....................................... 13

      F.      Plaintiffs were misled and harmed by Defendants. ................................... 14

      G.      No adequate remedy at law......................................................................... 20

V.      Class Action Allegations....................................................................................... 21

VI.     Causes of Action. .................................................................................................. 23

VII.    Jury Demand. ........................................................................................................ 38

VIII.   Prayer for Relief.................................................................................................... 38

## I.      Introduction.

1.      About 40% of American households use natural gas to cook. Many households use the gas stoves and cooktops daily to cook in the home.  Studies confirm however, that gas cooking has important risks.  Gas stoves "emit air pollutants… at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[1]  For example, gas cooking emits nitrogen oxides, which are "gases [that] can worsen asthma and other lung diseases."[2]  This is true for all consumers, adults and children alike, but is especially risky for children. *Id.*  Children living in households with gas stoves are "42% more likely to have asthma."[3]

2.      This risk is avoidable; manufacturers can reasonably design gas stoves to mitigate the risk of pollutants.  Manufacturers also can—and should—disclose the risk of pollutants to consumers, who can then make an informed choice about whether to buy a gas or electric appliance (which does not carry the same risk).

3.      Defendants Sub-Zero Group, Inc. and Wolf Appliance, Inc. make, sell, distribute, and market household appliances, including Wolf brand gas stoves, cooktops, and ovens. Plaintiffs purchased gas appliances made by Defendants.  Plaintiffs believed that the products were free from defects, and they did not know that gas cooking has significant pollutant risks. Had they known of the risks of pollutants from the gas stoves, they would not have purchased it.

4.      Plaintiffs bring this case for themselves and for other consumers who purchased Defendants' gas stoves, cooktops, and ovens.

## II.      Parties.

5.      Plaintiff John Bankhurst is domiciled in Chicago, Illinois.

6.      Plaintiff Pamela Anderson is domiciled in Riverwood, Illinois.

---

[1] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears
[2] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/
[3] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

7.      Plaintiff Jonathan Zang is domiciled in Boston, Massachusetts.

8.      Plaintiff Jesse Karp is domiciled in Oakland, California.

9.      The proposed class and subclasses (identified below) include citizens of all states.

10.     Defendant Sub-Zero Group, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

11.     Defendant Wolf Appliance, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

12.     Defendants make, distribute, sell, and market gas stoves, cooktops, and ovens products (under the brand name Wolf), and have done so throughout any applicable statute of limitations period.

**III.     Jurisdiction and Venue.**

13.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from Defendants.

14.     This Court has personal jurisdiction over Defendants. Defendants have their principal places of business in Wisconsin.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d). Defendants would be subject to personal jurisdiction in this District if this District were a separate state. Defendants are incorporated and have their principal places of business in this District.

**IV.     Facts.**

16.     About 40% of American households use natural gas stoves.[4]  Many households use natural gas daily to cook in the home.

---

[4] https://www.washingtonpost.com/business/energy/biden-isnt-coming-for-your-gas-stove-states-are/2023/01/13/12353d1e-9353-11ed-90f8-53661ac5d9b9_story.html

17.     Defendants make, market, distribute, and sell residential gas stoves, gas cooktops, and gas ovens ("Defendants' Products" or "Products"), under the brand name Wolf.  Some examples of Defendants' Products are shown below:[5]



48" Gas Range - 4 Burners and Infrared Dual Griddle

GR484DG

36" Gas Range - 4 Burners and Infrared Charbroiler

GR364C

30" Gas Range

GR304

18.     Defendants sell their products specifically for home use, and market to consumers for home use.  In fact, the only intended use for Defendants' Products is for cooking inside the home.

**A.      Gas stoves and cooktops produce health-harming pollutants.**

19.     Studies have confirmed that cooking with gas harms the health of the households that use it.[6]  Gas stoves "emit air pollutants such as nitrogen dioxide, carbon monoxide and fine particulate matter at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[7]

---

[5] https://www.subzero-wolf.com/wolf/configurator#sort=%40displayorder%20descending&numberOfResults=21&f:Type=[Gas]&wolfcategory=Ranges
[6] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/
[7] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears

20.     In particular, nitrogen oxides (sometimes written as NOx or NO2),[8] are hazardous to human health.  A "study published by researchers at Stanford calculated that emission of nitrogen dioxide from certain gas burners or ovens rose above the standard set for outdoors by the Environmental Protection Agency (EPA) within a few minutes."[9]

21.     This emission of harmful pollutants occurs because when gas stoves are turned on, they produce gases like nitric oxide and nitrogen dioxide as a byproduct of combustion.[10] All Defendants' Products emit these gases this way when they are used for cooking.

22.     Further, "EPA research also linked long-term NO2 exposure to cardiovascular effects, diabetes, poorer birth outcomes, premature mortality, and cancer."[11]  It is also linked to "reduced cognitive performance, especially in children."  *Id.*  "[E]arly-life exposure to air pollution from indoor gas appliances may be negatively associated with neuropsychological development through the first 4 years of life, particularly among genetically susceptible children."  *Id.*  "The gases can worsen asthma and other lung diseases."[12]  "In short, research shows that even low levels of NO2 exposure are dangerous, especially to the vulnerable."[13]

23.     "Yet…homes with gas stoves have around 50 percent, ranging up to over 400 percent, higher levels of NO2 than homes with electric stoves."[14] Concentrations of NO2 emissions from gas stoves can exceed US outdoor pollution standards several times over when conducting common cooking tasks like boiling water, baking a cake, roasting meat, and frying

---

[8] The term NOx is a common term for nitrogen oxides that include nitric oxide (NO) and nitrogen dioxide (NO2). https://www.encyclopedia.com/earth-and-environment/ecology-and-environmentalism/environmental-studies/nox-nitrogen-oxides
[9] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811
[10]  https://www.theguardian.com/environment/2023/jan/15/gas-stoves-pollution-alternatives
[11] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks
[12] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/
[13] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks
[14] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

bacon with a gas stove.  *Id.*  Thus, children living in households with gas stoves are "42% more likely to have asthma."[15]  A recent study "found that 12.7%...of current childhood asthma in the US is attributable to gas stove use."[16]  This is a level that is "similar to the childhood asthma burden attributed to secondhand smoke exposure."[17]  Data shows that, "the higher the nitrogen dioxide level, the more severe the asthma symptoms in children and adults."[18]

24.     In addition, cooking with gas stoves while windows are closed exacerbates the hazard of exposure to NO2.  A study found that while cooking with gas stoves increases NO2 concentrations in the home, and that this NO2 exposure is associated with increased nighttime inhaler use in children with asthma, cooking with gas stoves "while windows are closed is associated with even higher 24-hour NO2 concentrations."  Using gas stoves without a vent also increases NO2 exposure.  A study found that "gas can pose some risk of respiratory illness *particularly* where ventilation is inadequate and/or equipment is poorly made or maintained…. Unvented gas appliances, including stoves and ovens, can give rise to substantial quantities of NO2, ultrafine particles and CO."[19]  The World Health Organization Guidelines for Indoor Air Quality stated, "[t]he average nitrogen dioxide concentration over a period of several days may

---

[15] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

[16] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)

[17] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)

[18] Have a gas stove? How to reduce pollution that may harm health - Harvard Health

[19] Nigel Bruce and Kirk R Smith, WHO IAQ guidelines: household fuel combustion – Review 4: health effects of household air pollution (HAP), 2014, https://cdn.who.int/media/docs/default-source/air-pollution-documents/air-quality-and-health/who-iaq-guidelines-household-fuel-review_4.pdf (emphasis added); Koo LC, Ho JHC, Ho CY, Matsuki H, Shimizu H, Mori T, et al. Personal exposure to nitrogen dioxide and its association with respiratory illness in Hong-Kong. American Review of Respiratory Disease. 1990;141(5):1119-26; B. Seals & A. Krasner, Health Effects from Gas Stove Pollution, Rocky Mountain Institute et. al (2020) (RMI Report) (citing Integrated Science Assessment (ISA) For Oxides of Nitrogen – Health Criteria (Final Report, 2016).

exceed 150 μg/m3 when unvented gas stoves are used."[20]

25.    Using gas stoves for longer periods also increases NO2 exposure.  A study found that "each hour of cooking appliance use was associated with an 18ppb increase in 24-hour NO2 concentration, and in the cold season, each hour of cooking appliance use increased 24-hour NO2 concentration by 25ppb."[21]   Spending many hours in a home where gas stoves are used, such as 13 hours a day, also increases NO2 exposure.[22]   For example, a study found that "because preschool children spend much of their time in the home, they may be especially at risk of the adverse effects of indoor NO2 exposure."

26.    For these reasons, the American Medical Association adopted a resolution "recogniz[ing] the association between the use of gas stoves, indoor nitrogen dioxide levels and asthma," and committed to informing "members and, to the extent possible, health care providers, the public, and relevant organizations that use of a gas stove increases household air pollution and the risk of childhood asthma and asthma severity."[23]

**B.    Defendants know of this defect.**

27.    Defendants are aware that its Products emit health-harming pollutants—and were aware of this at the time each named Plaintiff and each member of the Classes made their purchase.

---

[20] https://www.ncbi.nlm.nih.gov/books/NBK138707/ (citing Pilotto LS, Douglas RM, Attewell RG, Wilson SR. Respiratory effects associated with indoor nitrogen dioxide exposure in children. Int J Epidemiol. 1997 Aug;26(4):788-96. doi: 10.1093/ije/26.4.788. PMID: 9279611).

[21] Paulin, L. M., Williams, D. L., Peng, R., Diette, G. B., McCormack, M. C., Breysse, P., & Hansel, N. N. (2017). 24-h Nitrogen dioxide concentration is associated with cooking behaviors and an increase in rescue medication use in children with asthma. Environmental research, 159, 118–123. https://doi.org/10.1016/j.envres.2017.07.052

[22] Hansel NN, Breysse PN, McCormack MC, Matsui EC, Curtin-Brosnan J, Williams DL, Moore JL, Cuhran JL, Diette GB. A longitudinal study of indoor nitrogen dioxide levels and respiratory symptoms in inner-city children with asthma. Environ Health Perspect. 2008 Oct;116(10):1428-32. doi: 10.1289/ehp.11349. Epub 2008 Jul 23. PMID: 18941590; PMCID: PMC2569107

[23] https://policysearch.ama-assn.org/policyfinder/detail/gas%20stove?uri=%2FAMADoc%2Fdirectives.xml-D-135.964.xml; https://publicinterestnetwork.org/updates/update-ama-moves-forward-resolution-gas-stove-pollution/

28.     Since the 1980s, the natural gas industry—of which Defendants are constituents—has worried that the US Consumer Product Safety Commission would regulate gas cooking appliances due to indoor air quality concerns.[24]

29.     This is because "[s]cientists have long known that gas stoves emit pollutants that irritate human airways and can cause or exacerbate respiratory problems."[25] "[S]tudies dating back decades have shown harmful effects from the NO2 in gas cooking stoves."[26]

30.     In 1986, a report by the Clean Air Scientific Advisory Committee of the U.S. Environmental Protection Agency stated, "Health effects data from epidemiological studies in gas stove homes suggest that young children are at increased risk of respiratory symptoms; and infection from exposures to elevated concentrations of N02. Other groups at risk to N02 exposures are asthmatics and bronchitics."[27] It further warned, "Human epidemiologic studies suggest that exposure to nitrogen dioxide may lead to increased respiratory illness rates among children." *Id.* at 6.

31.     Subsequent studies have confirmed the harmful effects of pollutants from gas cooking. "In a 1992 meta-analysis of studies on this topic, scientists at the EPA and Duke University found that nitrogen dioxide exposure that is comparable to that from a gas stove increases the odds of children developing a respiratory illness by about 20 percent."[28] "A 2013 meta-analysis of 41 studies found that gas cooking increases the risk of asthma in children and that NO2 exposure is linked with currently having a wheeze." *Id.* And "a study published last December found that 12.7 percent of childhood asthma cases in the U.S. can be attributed to gas stove use." *Id.*

32.     Like other makers of gas appliances, Defendants monitor and keep track of research on the health effects of its products. This is diligence that large companies like

---

[24] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it; https://www.sciencenews.org/archive/cleaner-cooking-gas
[25] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/
[26] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/
[27] Report of the Clean Air Scientific Advisory Committee, May 9, 1986, at 5.
[28] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/

Defendants routinely do when selling a consumer product.   Defendants are aware of the fact that their Products emit harmful pollutants, and were aware of this at the time Plaintiffs and class members made their purchases.

33.     Gas appliance makers, including Defendants, have well-established, industry-standard risk and compliance management processes in place. Gas appliance makers who are publicly traded companies, like many of Defendants' competitors, provide publicly available information about such processes.  For example, Defendants' competitor Whirlpool Corporation monitors "industry trends, regulatory developments and emerging issues" through its ESG Task Force.[29]  Whirlpool Corporation recognizes that "various municipal, state and federal regulators have discussed, proposed or enacted new regulations or bans on appliances that utilize natural gas."[30]  As another example, Defendants' competitor in the luxury appliance market, BSH Home Appliances Corporation maintains a robust risk management process.  BSH's "enterprise risk management (EMR) is focused on the early identification, assessment and management of those risks that can have a significant negative impact on the achievement of business objectives."[31] BSH identifies "regulatory issues" as a category in its catalogue of regularly reviewed risks.[32]  It is industry standard for appliance manufacturers to identify and monitor regulatory risks to their business.  Defendants, as private companies, do not publish internal processes.  But, Defendants follow industry standards when it comes to risk and compliance management.  So, Defendants have in place risk-management processes similar to those of its publicly-traded competitors.

34.     And through these risk management processes, Defendants would have been aware of potential and actual regulations of gas stoves due to the emissions of health-harming pollutants. For example, the EU Gas Appliances Regulation adopted on March 9, 2016, stated

---

[29] https://www.whirlpoolcorp.com/2022SustainabilityReport/whirlpool_2022_sr.pdf, at 11.
[30] Whirlpool Corporation 2022 Form 10-K, https://s202.q4cdn.com/229739679/files/doc_financials/2022/ar/1cfe8c92-5ee7-4628-a1b6-45014491d46a.pdf, at 12.
[31] https://media3.bsh-group.com/Documents/MCDOC01966996_BSH-Sustainability-KPIs-2015.pdf
[32] *Id.*

that gas appliances "shall be so designed and constructed that, when normally used, they do not cause a concentration of carbon monoxide or other substances harmful to health, such as they would be likely to present a danger to the health of persons and domestic animals exposed."[33] As Defendants' Products are distributed in Europe[34], Defendants were aware of the EU regulation, and worried that the same gas stove defect would lead to similar regulations elsewhere, including North America.  Defendants are aware that regulations in the US are a risk, because US agencies have indicated interest in regulating gas appliance indoor air quality concerns as early as 1983.[35]  Defendants represent they are "complying with all legal and regulatory requirements in the jurisdictions where we do business."[36]  To identify, assess, manage and regularly review these compliance risks, as part of its risk management processes, Defendants tracked research on the gas stoves' emissions of health-harming pollutants. Defendants are aware of the fact that its Products emit harmful pollutants, and have been since before the time of each Plaintiffs' purchase.  They are further aware that use of gas stoves increases the rates of respiratory illness in adults and children, and have been since before the time of each Plaintiffs' purchase.

   **C.    Safe alternative designs that would reduce the danger are available.**

   35.    Further, the harms could have been avoided through safe, reasonable alternative designs.  Alternative designs that "reduce harmful emissions, without sacrificing heat, have been available for decades."[37]  As one example, the "jet-powered infrared gas-range burner," developed in the 1980s, "consumed about 40% less natural gas to reach cooking temperatures and emitted 40% less nitrogen oxides."[38]  Another design proposed in the 1980s was the use of a

---

[33] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32016R0426
[34] https://www.subzero-wolf.com/international-landing?CountryCode=FR
[35] https://www.vox.com/policy-and-politics/23550747/gas-stove-health-concerns-new-history
[36] Sub-Zero Group, Inc., 2022 Sustainability Report at 5. https://www.subzero-wolf.com/company/-/media/files/united-states/2022-sustainability-annual-report.pdf
[37] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it
[38] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it

flame insert, which cuts the NOx emissions "more than 40 percent" when the burner is turned on high, and even more at low burner settings.[39]

36.     Despite this, Defendants failed to use an alternative design to avoid these harms and reduce harmful pollutants from its gas cooking appliances.

**D.     Defendants should have warned of the pollutant risk.**

37.     While Defendants were and are aware of the harmful health effects of gas cooking, everyday consumers are unaware of these risks.  Consumers shopping for a new oven, cooktop, or stove have very little information about the health risks of gas appliances.

38.     Consumers remain unaware because nothing on Defendants' packaging, instructions, or warning labels suggest that the gas cooking appliances regularly emit pollutants that are harmful to human health.  Further, the labels and warnings do not mention any risk of nitrogen oxides.

39.     Defendants sold their Products for cooking inside the home, while omitting any warning of the serious defect due to the harmful emissions.  Defendants knew of the defect, but actively concealed it.  Defendants should have, but did not, warn consumers of the fact that its Products emit harmful nitrogen oxides and pollutants when used for cooking.  These warnings could have been included on the packaging, stickers, or instruction manual for the product.  But Defendants did not include any such warning.

40.     Defendants had a duty to warn of the defect.  The defect was an unreasonable safety hazard.  Defendants could have avoided this risk by using available design-arounds.  In addition, the defect was central to the Product's function (i.e., its safety for use cooking inside the home).  Defendants had exclusive knowledge of the defect (which is unknown to everyday consumers).  Defendants also made partial representations that are misleading because other material facts were not disclosed.  In its use and care guide for the Products, Defendants included representations on the topic of known risks and dangers associated with the use of the Products.

---

[39] https://www.sciencenews.org/archive/cleaner-cooking-gas

These representations warned of other risks such as risks of gas leaks, fires, and tipping:

## IMPORTANT INSTRUCTIONS

**⚠ WARNING**

If the information in this guide is not followed exactly, a fire or explosion may result, causing property damage, personal injury, or death.

Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.

**WHAT TO DO IF YOU SMELL GAS:**
- Do not try to light any appliance.
- Do not touch any electrical switch.
- Do not use any phone in your building.
- Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions. If you cannot reach your gas supplier, call the fire department.

This appliance must be properly installed and serviced by a qualified installer, service agency, or gas supplier and grounded by a qualified technician.

**⚠ WARNING**

A child or adult can tip this appliance and be killed.

Verify the anti-tip device has been properly installed and engaged. Ensure the anti-tip device is re-engaged when this appliance is moved. Refer to the illustrations below for how to verify correct installation.

Do not operate this appliance without the anti-tip device in place and engaged. Failure to do so can result in death or serious burns to children or adults.

To reduce the risk of burns, do not move this appliance while hot.



Anti-tip device location



Anti-tip device engaged

Ex. 1, Wolf Gas Range Use and Care Guide at 3.

41.     But Defendants' warnings about the potential dangers associated with the use of gas stoves did not include a warning that the Products emit harmful pollutants like nitrogen dioxide.   Based on this, reasonable consumers believed that there was no such risk; otherwise, this danger would have been included in Defendants' listing of the dangers and risks associated with its Products.   Defendants provide the same, or substantially the same warnings in the use and care guides for all of its Products, including for the models that Plaintiffs Bankhurst, Anderson, Karp, and Zang bought. All of them warn of other dangers, but none of them warn that the Products emit harmful pollutants like nitrogen oxide.   So Defendants made the same or

11

substantially the same partial representations for all Products, and those partial representations are misleading in the same way for all Products.

42.     Defendants also affirmatively represented that the Products were safe and fit for ordinary home cooking by selling the Products for home use and marketing them as for the "home."  Defendants represent that "Home chefs will enjoy the power and finesse of professional kitchen appliances, knowing they can always create the dishes they have in mind with Wolf"[40] and that its Wolf Products are "from professional kitchens to your home."[41]  "Wolf brings decades of professional cooking expertise to the home."[42]  Defendants state "Our products are built with a singular goal: to provide the highest-caliber, specialized luxury home appliances in the marketplace."[43]  Defendant Wolf Appliance Inc. is an "industry specialist in residential cooking appliances."[44]  The "Residential" limited warranty for Defendants' Products covers "normal residential use" only.[45]  Defendants make these representations, or substantially similar ones, for all of the Products; and these representations are false and misleading in the same way for all Products.

43.     Defendants' continued sale of the Products, without providing warnings about the emissions of harmful pollutants, are not the result of accident or coincidence.  Defendants have known of the risk of harmful emissions for years, if not decades.  And Defendants have shown that they are able and willing to provide warnings about risks associated with the Products—such as fire and tipping risks.  Defendants had ample opportunity to include a warning about the harmful emissions with its gas stoves.  So, Defendants' continued sale of its Products, without warning, is the result of a decision committed, authorized, or ratified by Defendants' executives or directors.

---

[40] 2022 Wolf Distributor Price List, at 54. https://prclstprdncus.azureedge.net/files/Wolf-Price-List.pdf
[41] https://www.subzero-wolf.com/wolf
[42] https://www.subzero-wolf.com/company/our-heritage
[43] https://www.prnewswire.com/news-releases/sub-zero-and-wolf-unveil-new-products-and-design-innovations-in-virtual-showcase-301235816.html
[44] *Id.*
[45] Ex. 1, Wolf Gas Range Use and Care Guide at 15.

**E.     Defendants overcharge thousands of consumers.**

44.     If Defendants disclosed the truth— that is, that their Products emit harmful
pollutants, the price of their Products would fall dramatically.

45.     In late 2022 and early 2023, a flood of media articles reported the potential health
risks from gas stoves. Articles were published by CNN[46], New York Times[47], NBC News[48],
NPR[49], and other national news outlets.  These articles increased public awareness of studies that
found evidence of harmful emissions of gas stoves.  As a result, demand for gas stoves has
dropped. Defendants overcharge Plaintiffs and the class by not disclosing the truth that its
Products emit harmful pollutants.

46.     For example, a recent study showed that consumer demand for gas stoves falls as
consumers become informed of the harms of gas stoves.  Forty-six percent of gas-stove owning
adults were interested in replacing their gas stoves after being informed of the study showing the
link between gas stove pollution and childhood asthma.[50]

47.     If consumers knew the truth, demand for Defendants' Products would drop, and
Defendants could not sell their Products at current prices.

48.     In addition, the defective design of gas stoves, cooktops, and ovens reduces their
value.  Consumers pay for a product that is safe for home cooking, but receive a less valuable
product—one with a defective design that carries significant (and undisclosed) air pollution
risks.

---

[46] https://www.cnn.com/2023/01/18/opinions/gas-stove-debate-galarza-goldynia-ctrp/index.html
[47] https://www.nytimes.com/2023/01/11/well/live/gas-stoves-health-risks.html
[48] https://www.nbcnews.com/health/health-news/gas-stoves-leak-benzene-chemicals-linked-cancer-rcna52948
[49] https://www.npr.org/2023/01/13/1149135773/what-you-need-to-know-about-gas-stoves-and-health-risks
[50] https://morningconsult.com/2023/01/31/natural-gas-stove-bans-remain-divisive/

**F.      Plaintiffs were misled and harmed by Defendants.**

49.      In April 2018, John Bankhurst purchased a Wolf gas cooktop from a local appliance store in Chicago, Illinois.  The product had the model number of CG365PS.[51]



50.      In purchasing the item, Mr. Bankhurst relied on the representations on the marketing materials online. Mr. Bankhurst looked at representations on the Wolf website, to compare features and specifications for different Wolf models. Mr. Bankhurst also visited the Wolf showroom in Chicago, and understood that Wolf products were for household use. The online marketing materials did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides.  Thus, at the time of purchase, Mr. Bankhurst was unaware that the product emitted harmful pollutants such as nitrogen oxide.

51.      Mr. Bankhurst used the gas stove for regular cooking in the home.  He used the gas stove approximately 5 days a week for common cooking tasks such as boiling water.  This exposed him to a health-harming concentration of pollutants, especially nitrogen dioxide.  In addition, he was exposed to an even higher concentration of indoor pollutants because he consistently used the gas stove for cooking with the windows closed.  Mr. Bankhurst was exposed to a higher concentration of indoor pollutants because he occasionally used the stove for extended periods of time, such as cooking a stew or chili.  Mr. Bankhurst's niece and nephew

---

[51] *See* https://www.subzero-wolf.com/wolf/cooktops-and-rangetops/gas-stovetop/36-inch-professional-gas-cooktop-5-burners

also occasionally stayed in Mr. Bankhurst's home while Mr. Bankhurst had the gas stove, and were exposed to a dangerous level of pollutants from the gas stove during those periods.

52.     Mr. Bankhurst did not discover the truth until the fall of 2022, when he saw a NBC nightly news segment of the risks of harmful pollutants from gas appliances.  Mr. Bankhurst could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Mr. Bankhurst did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines.  Instead, it was only after there was widespread media coverage of the issue (in the fall of 2022), that Mr. Bankhurst discovered the truth.  Prior to this date, Mr. Bankhurst was unaware of the defect and these risks.

53.     In December 2020, Pamela Anderson purchased a Wolf gas cooktop from Abt Electronics while living in Riverwoods, Illinois.  The product had the model number of CG365PS (pictured above).

54.     In purchasing the item, Ms. Anderson went into Abt Electronics to compare features of Wolf's cooktops with those of other appliance brands such as JennAir and KitchenAid.  And when she received the cooktop, she looked at the manual that came with it. The manual did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides, or disclose the risks of these pollutants.  Thus, at the time of purchase, Ms. Anderson was unaware that the product emitted harmful pollutants such as nitrogen oxide.

55.     Ms. Anderson used the gas cooktop for regular cooking in the home.  She used the gas cooktop approximately 5-7 times a week for common cooking tasks such as cooking eggs.  This exposed her to a health-harming concentration of pollutants, especially nitrogen dioxide.  In addition, she was exposed to an even higher concentration of indoor pollutants because she consistently used the gas cooktop for cooking with the windows closed.  She was also exposed to a higher concentration of indoor pollutants when she used the gas cooktop for longer periods.  Ms. Anderson used the gas cooktop for cooking soups or pasta sauces for two or

15

more hours at a time.

56.     Ms. Anderson only discovered the truth in or around fall 2022, when she saw a television news report of the risks of harmful pollutants from gas stoves.  Ms. Anderson could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Ms. Anderson did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines.  Instead, it was only after there was widespread media coverage of the issue, that Ms. Anderson discovered the truth.  Prior to this date, Ms. Anderson was unaware of the defect and these risks.

57.     In or around June 2020, Jesse Karp purchased a Wolf gas range from Friedmans Appliance in Pleasant Hill, California. The product had the model number of GR366.



58.     In purchasing the item, Mr. Karp looked at reviews of Wolf gas stoves.  Mr. Karp went into Friedmans Appliance to view model stoves and compare the features of different appliance brands such as GE and Thermador.  Once the stove was installed in his home, Mr. Karp looked at the manual that came with it to confirm how to properly operate the stove.  The manual did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides, or disclose the risks of these pollutants.  Thus, at the time of purchase, Mr. Karp was

16

unaware that the product emitted harmful pollutants such as nitrogen oxide.

59.     Mr. Karp used the gas stove for regular cooking in the home.  He used the gas stove multiple times a day, to cook lunch or dinner.  On average, he used the gas stove approximately 35 minutes per meal.  He used the gas stove for common cooking tasks, such as roasting chicken, boiling water or sautéing.  This exposed him to a health-harming concentration of pollutants, especially nitrogen dioxide.  In addition, he was exposed to an even higher concentration of indoor pollutants because he consistently used the gas stove for cooking with the windows closed.  Mr. Karp was also exposed to a higher concentration of indoor pollutants when he used the gas stove for longer periods.  Mr. Karp used the gas stove for slow cooking, sometimes for five or more hours at a time.

60.     Mr. Karp only discovered the truth in or around fall 2022, when he saw news articles report on the risks of harmful pollutants from gas stoves.  Mr. Karp could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Mr. Karp did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines.  Instead, it was only after there was widespread media coverage of the issue, that Mr. Karp discovered the truth.  Prior to this date, Mr. Karp was unaware of the defect and these risks.

61.     In or around winter 2018, Jonathan Zang purchased a Wolf gas range online while living in Boston, Massachusetts, for his home in New York. The product had the model number of GR366-LP.



62.     In purchasing the item, Mr. Zang relied on the representations on the marketing materials online.  Mr. Zang looked at materials online about the Wolf gas range, including online reviews of the product.  Once the range was installed in his home, Mr. Zang looked at the manual that came with it.  Mr. Zang recalls seeing warnings about tipping and the range's enamel coating.  The online marketing materials and manual did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides, or disclose the risks of these pollutants.  Thus, at the time of purchase, Mr. Zang was unaware that the product emitted harmful pollutants such as nitrogen oxide.

63.     Mr. Zang used the gas range for regular cooking in the home.  Mr. Zang used the stove at least 7 times a week, on average for one hour a day.  This exposed him to a health-harming concentration of pollutants, especially nitrogen oxide.  In addition, he was exposed to an even higher concentration of indoor pollutants because he consistently used the gas range for cooking with the windows closed and without the ventilation of a hood.  Mr. Zang was also exposed to a higher concentration of indoor pollutants when he used the gas range for longer

periods.  If there was an issue with his home's heat, Mr. Zang would use the gas range for heating his home.

64.     Mr. Zang only discovered the truth in or around fall 2022, when he listened to an NPR Morning Edition episode on the risks of harmful pollutants from gas stoves.  Mr. Zang could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Mr. Zang did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines.  Instead, it was only after there was widespread media coverage of the issue, that Mr. Zang discovered the truth.  Prior to this date, Mr. Zang was unaware of the defect and these risks.  Before this, Mr. Zang had no reason to search for information on a defect that he did not know about.

65.     Defendants provided the Products to retailers such as Friedmans Appliance and Abt Electronics, with the intention that the ultimate purchasers of the Products would be consumers like Plaintiffs who use the Products at home.  As manufacturers specializing in "luxury home appliances,"[52] Defendants' products are targeted to consumers like Plaintiffs as the end user.  Defendants' user guides for its gas ranges and gas cooktops directly address purchasers who use the Products at home.  The guide states that the "Wolf Appliance Residential Limited Warranty" only apply to the appliance "under normal residential use."[53]

66.     Plaintiffs purchased Defendants' Product based on the understanding that using the Product would not expose them to a significant air pollutant risk.  Plaintiffs would not have purchased Defendants' Product had they known that it emitted harmful pollutants like nitrogen oxide.

67.     As a result, Plaintiffs suffered injury in fact when they: (a) spent money to purchase a Product they would not otherwise have purchased absent Defendants' misconduct; (b) overpaid for the Product due to Defendants' misconduct; and (c) paid for a defective product

---

[52] https://www.prnewswire.com/news-releases/sub-zero-and-wolf-unveil-new-products-and-design-innovations-in-virtual-showcase-301235816.html
[53] Ex. 1, Wolf Gas Range Use and Care Guide at 15.

that, in truth, is worth less than they paid for it.

68.    Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.  Plaintiffs like Defendants' Products, and would purchase Defendants' Products in the future if the Product was redesigned to avoid emitting harmful pollutants.  They face an imminent risk of harm, however, because they cannot rely on representations that the Product is safe for cooking inside the home or the absence of any pollutant warning.  Absent injunctive relief, Defendants may continue to advertise, promote, and sell the Products while representing that it is safe, and without warning the public about the health risks.

### G.    No adequate remedy at law.

69.    Plaintiffs seek damages and, in the alternative, restitution.  Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

70.    A legal remedy is not adequate if it is not as certain as an equitable remedy. To obtain a full refund as damages, Plaintiffs must show that the Products they received have essentially no market value.  In contrast, Plaintiffs can seek restitution without making this showing.  This is because Plaintiffs purchased Products that they would not otherwise have purchased, but for Defendants' omissions.  Obtaining a full refund at law is less certain that obtaining a refund in equity.

71.    In addition, the elements of Plaintiffs' equitable claims are different and do not require the same showings as Plaintiffs' legal claims.  For example, obtaining damages under the CLRA requires a plaintiff to show that Defendants made negligent or fraudulent misrepresentations.  No such requirement exists for plaintiffs to obtain equitable relief, for example under the "unfair" or "unlawful" prong of the UCL.  Because a plaintiff must make this additional showing to obtain damages, rather than restitution, the legal remedies are more uncertain.

72.    The remedies at law available to Plaintiffs are not equally prompt or otherwise efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will take longer, and be more expensive, than a bench trial.

V.     **Class Action Allegations.**

73.      Plaintiffs brings certain claims on behalf of the proposed class of:

- Nationwide Class: all persons who purchased Defendants' Products while living in the United States during the applicable statute of limitations (the "Nationwide Class");

- Illinois Subclass: all persons who, while living in the state of Illinois, purchased Defendants' Products during the applicable statute of limitations;

- Massachusetts Subclass: all persons who, while living in the state of Massachusetts, purchased Defendants' Products during the applicable statute of limitations;

- California Subclass: all persons who, while living in the state of California, purchased Defendants' Products during the applicable statute of limitations; and

- Consumer Protection Subclass: all persons who, while living in certain identified states (the "Consumer Protection Subclass States"), purchased Defendants' Products during the applicable statute of limitations.

74.     The Consumer Protection Subclass States are as follows: California, Connecticut, Illinois, Maryland, Missouri and New York.

75.     The following people are excluded from the proposed Class and Subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

76.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

*Numerosity & Ascertainability.*

77.     The proposed class contains members so numerous that separate joinder of each member is impractical.  There are tens or hundreds of thousands of class members.  The precise number of class members is unknown to Plaintiffs at this time.

78.     Members of the proposed class can be identified through public notice.

*Predominance of Common Questions.*

79.     There are questions of law and fact common to the proposed class.  Common questions of law and fact include, without limitation:

(1) Whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

(2) Whether Defendants' conduct was unfair and/or deceptive;

(3) Whether Defendants breached an implied warranty;

(4) What damages are needed to compensate Plaintiffs and the proposed class; and

(5) Whether an injunction is necessary to prevent Defendants from continuing to market and sell the Products.

*Typicality & Adequacy.*

80.     Plaintiffs' claims are typical of the other class members' claims.  Like other class members, Plaintiffs purchased Defendants' Products.

81.     The interests of the members of the proposed class and subclass will be adequately protected by Plaintiffs and their counsel. Plaintiffs' interests are aligned with, and do not conflict with, the interests of the members of the proposed class or subclass that they seek to represent. Moreover, Plaintiffs have retained experienced and competent counsel to prosecute the class and subclasses' claims.

*Superiority.*

82.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members,

which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that the same product is found unfit for its ordinary use for some proposed class members, but not for others.

83.    Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member.

84.    A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

**VI.    Causes of Action.**

<u>**Count I: Violation of Magnuson-Moss Warranty Act,**</u>

<u>**15 U.S.C. §2301, *et seq.***</u>

**(on behalf of Plaintiffs and the Nationwide Class)**

85.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

86.    Plaintiffs bring this count individually and for the Nationwide Class, or in the alternative, the Subclasses of their respective State.

87.    Defendants' Products are each a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(1).

88.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(3).

89.    Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(4)-(5).

90.    As the manufacturers of residential gas appliances, Defendants impliedly warranted to Plaintiffs and the class that the Products were of merchantable quality and were safe

for their ordinary use in home cooking.

91.     As described in detail above, the Products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used. Specifically, the Products are inherently flawed given a defect in design making them emit health-harming pollutants when used to cook inside the home.  The defective design makes them unfit for ordinary purposes even when used correctly.

92.     In addition, Defendants' Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

93.     Thus, Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

94.     Due to the defect in the Products, the Products are not suitable for their intended purpose.

95.     Defendants' breach of implied warranties has deprived Plaintiffs and class members of the benefit of their bargain.

96.     Plaintiffs and the class were foreseeable third-party beneficiaries of Defendants' sale of the Products.  Defendants sell the Products to retailers for distribution and sale to consumers such as Plaintiffs and class members.

97.     The amount in controversy of Plaintiffs' individual claims exceed $25.  The amount in controversy of this action exceeds the sum value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

98.     Defendants have been afforded a reasonable opportunity to cure its breach, including after Plaintiffs sent notice letters informing Defendants of the breach.

99.     Defendants' breaches directly caused Plaintiffs and class members harm. Plaintiffs and class members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and

thus less valuable than what they paid for.

<u>**Count II: Violation of California's Unfair Competition Law**</u>

**(on behalf of Plaintiff Karp and the California Subclass)**

100.     Plaintiff Karp incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

101.     Plaintiff Karp brings this cause of action on behalf of himself and members of the California Subclass.

102.     Defendants have violated California's Unfair Competition Law (UCL) by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

***The Unlawful Prong***

103.     As alleged in detail above and below, Defendants engaged in unlawful conduct by violating the CLRA, FAL, and Song-Beverly Consumer Warranty Act, as incorporated here.

***The Fraudulent Prong***

104.     As alleged in detail above, Defendants' representations and omissions concerning the products' defect were misleading.  Defendants' representations and omissions were likely to deceive, and did deceive, Plaintiff Karp and reasonable consumers.

***The Unfair Prong***

105.     Defendants violated established public policy by violating the CLRA, the FAL, and the Song-Beverly Consumer Warranty Act, as alleged below and incorporated here.  The unfairness of this practice is tethered to a legislatively declared policy (that of the CLRA, FAL, and the Song-Beverly Consumer Warranty Act).

106.     Defendants' conduct caused substantial injury to Plaintiff Karp and Subclass members.  The harm to Plaintiff Karp and the Subclass greatly outweighs the public utility of Defendants' conduct (which is none).  Defendants distributed household appliances that emit harmful pollutants, when reasonable alternative designs exist.  Defendants also omitted any warning about these pollutants.  These actions do not have public utility. This injury was not

outweighed by any countervailing benefits to consumers or competition.

107.    Plaintiff Karp and the Subclass could not have reasonably avoided this injury.  As alleged above, Defendants' representations and omissions were deceptive to reasonable consumers.

108.    Defendants' conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

109.    Defendants' conduct violated the public policy against misleading product labels and defective products, which is tethered to the CLRA and FAL, as well as the Song-Beverly Consumer Warranty Act.

* * *

110.    For all prongs, Plaintiff Karp saw and reasonably relied on Defendants' misleading representations and omissions when purchasing the Product.

111.    Defendants sold its Products specifically for cooking inside the home, while omitting any warning of the serious safety defect regarding harmful emissions.  Defendants knew of the defect, but actively concealed it.  Defendants should have, but did not, warn consumers of the risk of harmful pollutants while cooking.  This warning could have been included on the packaging for the product, or on stickers on the product itself.  But Defendants did not include any such warning.

112.    As alleged in detail above, Defendants had a duty to warn of this defect.

113.    As alleged in detail above, Defendants' misleading representations and omissions were material.  The defect would have been important to the purchase of Plaintiff Karp and other reasonable consumers.  Subclass-wide reliance can be inferred because Defendants' misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Defendants' Products.  Defendants' misleading representations and omissions were a substantial factor in Plaintiff Karp's purchase decision and the purchase decisions of class members.

114.    Plaintiff Karp and Subclass members were injured as a direct and proximate result

of Defendants' conduct because: (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

### Count III: Violation of California's False Advertising Law (FAL)
### (on behalf of Plaintiff Karp and the California Subclass)

115.    Plaintiff Karp incorporates by reference and re-alleges each and every allegation set forth above in Sections I-IV as though fully set forth herein.

116.    Plaintiff Karp brings this cause of action on behalf of himself and members of the California Subclass.

117.    As alleged more fully above, Defendants have falsely advertised its Products by making misleading representations and omissions.  Defendants sold its Products for cooking inside the home, and omitted any warning that the Products emit harmful pollutants.  For example, Defendants market the Wolf Products for residential use by consumers inside the house, while failing to warn that it emits harmful pollutants when consumers cook with it.  The representations and omissions are misleading because the Products emit health-harming pollutants.  Defendants knew of this defect, but failed to include any warning about the defect. Plaintiff Karp relied on these representations and omissions.

118.    As alleged more fully above, Defendants' representations and omissions were likely to deceive, and did deceive, Plaintiff Karp and reasonable consumers.  Defendants knew, or reasonably should have known, that its representations and omissions were misleading.

119.    As alleged in detail above, Defendants' misrepresentations and omissions were material.  Thus, subclass-wide reliance can be inferred.

120.    As alleged in detail above, Defendants' representations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff Karp and subclass members.

121.    Plaintiff Karp and subclass members were injured as a direct and proximate result

of Defendants' conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

### Count IV: Violation of California's Consumer Legal Remedies Act (CLRA)

### (on behalf of Plaintiff Karp and the California Subclass)

122.    Plaintiff Karp incorporates by reference and re-alleges each and every allegation set forth above in Sections I-IV as though fully set forth herein.

123.    Plaintiff Karp brings this cause of action on behalf of himself and members of the California Subclass.

124.    Plaintiff Karp and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d).

125.    Plaintiff Karp, the other members of the California Subclass, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(c).

126.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

127.    As alleged more fully above, Defendants have violated the CLRA by advertising its Products in a way that is misleading or is likely to deceive consumers.  Defendants failed to warn that its Products, which are sold for use in the home, emit health-harming pollutants.  Defendants have also violated the CLRA by failing to warn of a material defect with the product.

128.    As a result of engaging in such conduct, Defendants have violated California Civil Code §§ 1770(a)(2), (a)(5), (a)(7), and (a)(9).

129.    As alleged more fully above, Defendants' conduct was likely to deceive, and did deceive, Plaintiff Karp and reasonable consumers.  Defendants knew that its products emitted harmful pollutants.  Defendants' failure to warn consumers that the Products emit harmful

pollutants was deceptive.

130.    Plaintiff Karp saw and reasonably relied on Defendants' misleading representations and omissions when purchasing the Product.

131.    As alleged in detail above, Defendants had a duty to warn of this defect.

132.    As alleged in detail above, Defendants' misleading representations and omissions were material.  Thus, subclass-wide reliance can be inferred.  Defendants' misleading representations and omissions were a substantial factor in Plaintiff Karp's purchase decision and the purchase decisions of subclass members.

133.    Plaintiff Karp and subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

134.    Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiff Karp, on behalf of himself and all other members of the California Subclass, seeks injunctive relief.

135.    CLRA § 1782 NOTICE.  On August 30, 2023, Plaintiff Karp mailed a notice letter to Defendants at their Madison, Wisconsin headquarters.  This letter provided notice of Defendants' violation of the CLRA and demanded that Defendants correct the unlawful, unfair, false and/or deceptive practices alleged here.  Defendants did not respond. Accordingly, Plaintiff Karp and the subclass seek all monetary and equitable relief available under the CLRA, including reasonable attorneys' fees and punitive damages.

## Count V: Breach of Implied Warranty

### Pursuant to Song-Beverly Consumer Warranty Act

#### (on behalf of Plaintiff Karp and the California Subclass)

136.    Plaintiff Karp incorporates by reference and re-alleges each and every allegation set forth above in Sections I-IV as though fully set forth herein.

137.    Plaintiff Karp brings this cause of action on behalf of himself and members of the

California Subclass.

138.   Plaintiff Karp is a "buyer" within the meaning of Cal. Civ. Code §1791(b).

139.   Defendants' Products are "consumer goods" within the meaning of Cal. Civ. Code §1791(a).  Defendants' Products are for use inside of the house.

140.   Defendants are the "manufacturer" of Defendants' Products within the meaning of Cal. Civ. Code § 1791(j). Defendants are in the business of manufacturing or distributing Defendants' Products.

141.   Defendants impliedly warranted that Defendants' Products were in merchantable condition and fit for the ordinary purpose for which the Products are used (cooking inside the home) under Cal. Civ. Code §§ 1791.1(a) & 1792.

142.   As alleged in detail above, Defendants' Products did not have the quality that a buyer would reasonably accept, and therefore were not merchantable.

143.   As alleged in detail above, Defendants' Products would not pass without objection in the home appliances trade because they emit harmful pollutants, and fail to warn of these risks.

144.   As alleged in detail above, Defendants' Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

145.   Defendants breached the implied warranty of merchantability and fitness by selling its Products containing defects.  These defects have deprived Plaintiff Karp and the Subclass of the benefit of the bargain, and have caused the Products to depreciate in value.

146.   Plaintiff Karp and subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

147.   Plaintiff Karp and Subclass members are entitled to damages and other legal and equitable relief, costs, and attorneys' fees.

## Count VI: Breach of the Illinois Consumer Fraud and
## Deceptive Business Practices Act, 815 ILCS 505/2

**(on behalf of Plaintiffs Bankhurst and Anderson and the Illinois Subclass)**

148.    Plaintiffs Bankhurst and Anderson incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

149.    Plaintiffs Bankhurst and Anderson bring this cause of action on behalf of themselves and members of the Illinois Subclass, seeking reasonable attorneys' fees, actual damages, and other relief.

150.    Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

151.    Plaintiffs and the members of the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(c).

152.    Plaintiffs and the Illinois Subclass purchased the Products in Illinois.

153.    The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

154.    Defendants participated in misleading, false, or deceptive acts that violated the Illinois statute. The conduct alleged in this Complaint constitutes unfair or deceptive methods of competition, and the conduct was undertaken by Defendants in transactions intended to result in reliance.  The conduct did result in, the sale of goods to consumers.

155.    As alleged more fully above, Defendants advertised their Products in a way that is misleading or is likely to deceive consumers.  Defendants' statements and omissions led Plaintiffs and other members of the Illinois Subclass to believe that their Products are safe and fit for ordinary use when cooking in the home, when in fact, the Products emit health-harming pollutants.  Defendants also failed to warn of a material defect with the product.  Defendants'

representations and omissions concerning the Products' defect were misleading.  Defendants' representations and omissions were likely to deceive, and did deceive, a substantial portion of the public into believing that the product did not suffer from a defect.

156.   Even though Defendants were aware of a material defect— that the Products emitted health-harming pollutants including nitrogen dioxides—Defendants sold their Products without notifying customers of this defect.  Instead, Defendants omitted this information, and intended that consumers would rely on the omission.  Plaintiffs and the Subclass relied on Defendants' silence, and purchased Defendants' Products.

157.   As alleged above, Defendants' representations and omissions are unfair.  They offend public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers.

158.   As alleged above, Defendants' representations and omissions were willful and knowing.

159.   Defendants' representations and omissions occurred in the conduct of trade and commerce affecting the people of the State of Illinois.

160.   Defendants' representations and omissions were material. As alleged in detail above, these representations were important to consumers and affected their choice to purchase the Products. And, as alleged in detail above, these representations were likely to mislead, and did mislead, reasonable consumers.

161.   Plaintiffs and Subclass members were injured as a direct and proximate result of Defendants' conduct because: (a) they would not have purchased the Products if they had known of the defect, (b) they overpaid for the Products because the Products are sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

162.   Plaintiffs and the Subclass seek actual damages, an injunction, reasonable attorneys' fees, expenses, and all other available relief.

**Count VII: Violations of Massachusetts Gen. Laws Ch. 93A**

**(on behalf of Plaintiff Zang and the Massachusetts Subclass)**

163.    Plaintiff Zang incorporates each and every factual allegation set forth above.

164.    Plaintiff Zang brings this claim on behalf of himself and the Massachusetts Subclass.

165.    Defendants are "persons" as that term is defined in MA. Gen. Laws Ch. 93A §1.

166.    Defendants engage in the conduct of trade or commerce as defined under MA Gen. Laws §93A 1(b).

167.    Defendants marketed and sold the Wolf Products to consumers in Massachusetts. Defendants' unfair and deceptive conduct with respect to Plaintiff Zang and the members of the Massachusetts subclass occurred primarily and substantially in Massachusetts, where Plaintiff and subclass members purchased Defendants' Products and were deceived and harmed as a result of Defendants' conduct.

168.    Defendants' representations and omissions were material.  As alleged in detail above, these representations were important to consumers and affected their choice to purchase the Products.  And, as alleged in detail above, these representations were likely to mislead reasonable consumers and Defendants intended that reasonable consumers rely on it. Defendants' conduct, as alleged in detail above, constitutes unfair and deceptive acts and practices that violate MA. Gen. Laws Ch. 93A §2.  Defendants' unfair and deceptive conduct was a willful and knowing violation of MA. Gen. Laws Ch. 93A §2 and Plaintiff Zang and the proposed subclasses' rights.

169.    Plaintiff Zang and Subclass members were injured as a direct and proximate result of Defendants' conduct, and this conduct was a substantial factor in causing them harm, because (a) they would not have purchased the Products at the price they paid if they had known of the defect and (b) they overpaid for the products because the products are sold at a price premium due to the misrepresentation.

170.    On August 31, 2023, Plaintiff Zang mailed a notice letter to Defendants at their

Madison, Wisconsin headquarters.  This letter provided notice of Defendants' violation of the MA Gen. Laws Ch. 93A.  Defendants did not tender a written settlement offer within 30 days of receipt of the letter. Accordingly, Plaintiff Zang and the subclass seek reasonable attorneys' fees, treble damages, and other relief.

<u>**Count VIII: Violations of State Consumer Protection Statutes**</u>

**(on behalf of Plaintiffs and the Consumer Protection Subclass)**

171.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

172.    This count is brought on behalf of Plaintiffs and the Consumer Protection Subclass for violations of the following state consumer protection statutes:

| State | Statute |
|---|---|
| California | Cal. Bus. & Prof. Code § 17200, and the following; *Id.* §17500, and the following; Cal. Civ. Code §1750 and the following. |
| Connecticut | Conn. Gen Stat. Ann. § 42- 110, and the following. |
| Illinois | 815 ILCS § 501/1, and the following. |
| Maryland | Md. Code Ann. Com. Law, § 13-301, and the following. |
| Missouri | Mo. Rev. Stat. § 407, and the following. |
| New York | N.Y. Gen. Bus. Law § 349, and the following. |

173.    Each of these consumer protection statutes prohibits unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or services to consumers.

174.    As alleged in detail above, Defendants' conduct, including the marketing and sale of its Products to consumers, violates each statute's prohibitions.

175.    As further alleged above, Defendants' misrepresentations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of Subclass

members.  Defendants' misrepresentations and omissions were misleading to a reasonable consumer, and Plaintiffs and Subclass members reasonably relied on Defendants' misrepresentations.

176.    Plaintiffs and Subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased the Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

177.    In this way, Plaintiffs and the members of the proposed Subclass have suffered an ascertainable loss, in an amount to be determined at trial.

<strong><u>Count IX: Breach of Implied Warranty of Merchantability</u></strong>

<strong>(on behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, and Massachusetts Subclasses)</strong>

178.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

179.    Plaintiffs bring this count individually and for the Nationwide Class, or in the alternative, the Subclasses of their respective State.

180.    The Uniform Commercial Code § 2-314 states that "a warranty that [] goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." "Merchantable" goods must be "fit for the ordinary purposes for which the goods are used."

181.    Defendants are and were, at all relevant times, merchants with respect to home appliances, and with respect to residential Products in particular.  Defendants' Products each constitutes a "good" under the UCC.

182.    Plaintiffs and Subclass members purchased Defendants' Products.

183.    As the manufacturers of residential gas appliances, Defendants impliedly warranted to Plaintiffs and the Subclass that the products were of merchantable quality and were

safe for their ordinary use in home cooking.  In fact, as described in detail above, the products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used.  Specifically, the Products are inherently flawed given a defect in design making them emit health-harming pollutants when used to cook inside the home.  The defective design makes them unfit for ordinary purposes even when used correctly. In addition, Defendants' Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

184.    Thus, Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

185.    Plaintiffs and the Subclass were foreseeable third-party beneficiaries of Defendants' sale of the Products.  Defendants sell the Products to retailers for distribution and sale to consumers such as Plaintiffs and Subclass members.

186.    Defendants' breach directly caused Plaintiffs and Subclass members harm. Plaintiffs and Subclass members were injured as a direct and proximate result of Defendants' conduct because (a) they would not have purchased Defendants' Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

### Count X: Fraudulent Omission

**(on behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois and Massachusetts Subclasses)**

187.    Plaintiffs incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

188.    Plaintiffs bring this count individually and for the Nationwide Class, or in the alternative, the Subclasses of their respective State.

189.    As alleged in detail above, Defendants made materially misleading omissions concerning the safety of its Products.  Defendants concealed information about the harmful

pollutants emitted by its Products.

190.    In deciding to purchase consumer products from Defendants, Plaintiffs and the Subclass reasonably relied on Defendants' omissions to form the mistaken belief that the Products did not pose a significant pollutant risk.

191.    As alleged in detail above, Defendants' fraudulent conduct was knowing and intentional.  The omissions made by Defendants were intended to induce and actually induced Plaintiffs and Subclass members to purchase the Products.  Plaintiffs would not have purchased the products had they known of the defect.  Subclass-wide reliance can be inferred because Defendants' omissions were material, i.e., a reasonable consumer would consider them important to their purchase decision.

192.    As alleged in detail above, Defendants had a duty to disclose the defect.

193.    Plaintiffs and Subclass members were injured as a direct and proximate result of Defendants' fraudulent omissions because (a) they would not have purchased the Products if they had known the Products were unsafe and unfit for use; (b) they overpaid for the Products because the Products are sold at a price premium due to Defendants' misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

194.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### Count XI: Quasi-contract

### (on behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, Illinois, and Massachusetts Subclasses)

195.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

196.    Plaintiffs bring this count individually and for the Nationwide Class, or in the

alternative, the Subclasses of their respective State.

197.    Plaintiffs and Class members conferred a tangible and material economic benefit upon Defendants by purchasing the Products.

198.    In exchange for the purchase price, Defendants provided a defective product, without a reasonable warning. Defendants knew and appreciated the benefit they incurred from consumers purchasing Products.

199.    Thus, Defendants are aware of, and has retained, the unjust benefit conferred upon them by Plaintiffs and the Class members.

200.    Defendants received a direct and unjust benefit, at the Plaintiffs' and the Class's expense.

201.    Plaintiffs and the Class seek restitution.

**VII.    Jury Demand.**

202.    Plaintiffs demand a jury trial on all issues so triable.

**VIII.    Prayer for Relief.**

203.    Plaintiffs seek the following relief individually and for the proposed class and subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;
- An order appointing Plaintiffs as representatives for the Nationwide Class and each Subclass, and appointing their counsel as lead counsel for the classes;
- A judgment in favor of Plaintiffs and the proposed classes;
- Damages, treble damages, statutory damages, and punitive damages where applicable;
- Restitution;
- Disgorgement, and other just relief;
- An order awarding Plaintiffs and all other class members damages in an amount to be determined at trial for the wrongful acts of Defendants;
- Pre- and post-judgment interest on all amounts awarded;

- Injunctive relief as pleaded or as the Court may deem proper;

- Reasonable attorneys' fees and costs, as allowed by law;

- Punitive damages; and

- Any additional relief that the Court deems reasonable and just.

Dated: October 6, 2023                    Respectfully submitted,

                                          By: */s/ Simon Franzini*

                                          Simon Franzini (Cal. Bar No. 287631)*
                                          simon@dovel.com
                                          Christin Cho (Cal. Bar No. 238173)*
                                          christin@dovel.com
                                          Jonas B. Jacobson (Cal. Bar No. 269912)
                                          jonas@dovel.com
                                          DOVEL & LUNER, LLP
                                          201 Santa Monica Blvd., Suite 600
                                          Santa Monica, California 90401
                                          Telephone: (310) 656-7066
                                          Facsimile: (310) 656-7069

                                          *Attorneys for Plaintiffs*

                                          * Admitted Pro Hac Vice